IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, *et al.,* | ) ) ) ) ) | |
| | ) | CASE NO. 4:11-cv-15497 |
| Plaintiffs, | ) ) | |
| | ) | JUDGE GERSHWIN DRAIN |
| v. | ) ) | |
| KELSEY-HAYES COMPANY, TRW AUTOMOTIVE, INC., and TRW AUTOMOTIVE HOLDINGS CORP., | ) ) ) ) | |
| Defendants. | ) ) | |

Stuart M. Israel (P15359)
John G. Adam (P37205)
LEGGHIO & ISRAEL, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
Telephone: (248) 398-5900
Email:  israel@legghioisrael.com
          jga@legghioisrael.com

*Attorneys for Plaintiffs*

Joseph P. Stuligross
Cara Krueger
USW International Union
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2533
Email:  jstuligross@usw.org
          ckrueger@usw.org

*Attorneys for Plaintiff USW*

Gregory V. Mersol (OH 0030838)
Todd A. Dawson (OH 0070276)
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, OH  44114-3485
Telephone:  (216) 621-0200
Facsimile:  (216) 696-0740
Email:  gmersol@bakerlaw.com
          tdawson@bakerlaw.com

*Attorneys for Defendants*

**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

Defendants Kelsey-Hayes Company, TRW Automotive Inc., and TRW Automotive Holdings Corp., pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and this Court's Order dated September 28, 2015, hereby renew their motion for summary judgment in their favor on the grounds that there are no genuine issues of material fact, and defendants are entitled to judgment as a matter of law.  The reasons supporting this motion are more fully set forth in the attached memorandum, which is incorporated by reference herein.

Respectfully submitted,

s/ Gregory V. Mersol
GREGORY V. MERSOL (0030838)
GMERSOL@BAKERLAW.COM
TODD A. DAWSON (0070276)
TDAWSON@BAKERLAW.COM
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, Ohio 44114-3485
Telephone:      (216) 621-0200
Facsimile:      (216) 696-0740

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STEEL, PAPER AND FORESTRY,    )
RUBBER, MANUFACTURING, ENERGY,    )
ALLIED INDUSTRIAL AND SERVICE    )
WORKERS INTERNATIONAL UNION,    )
AFL-CIO-CLC, *et al.,*    )
   )   CASE NO. 4:11-cv-15497
     Plaintiffs,    )
   )   JUDGE GERSHWIN DRAIN
v.    )
   )
KELSEY-HAYES COMPANY, TRW    )
AUTOMOTIVE, INC., and TRW    )
AUTOMOTIVE HOLDINGS CORP.,    )
   )
     Defendants.    )

Stuart M. Israel (P15359)
John G. Adam (P37205)
LEGGHIO & ISRAEL, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
Telephone: (248) 398-5900
Email:  israel@legghioisrael.com
       jga@legghioisrael.com

*Attorneys for Plaintiffs*

Joseph P. Stuligross
Cara Krueger
USW International Union
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2533
Email:  jstuligross@usw.org
       ckrueger@usw.org

*Attorneys for Plaintiff USW*

Gregory V. Mersol (OH 0030838)
Todd A. Dawson (OH 0070276)
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, OH  44114-3485
Telephone:  (216) 621-0200
Facsimile:  (216) 696-0740
Email:  gmersol@bakerlaw.com
       tdawson@bakerlaw.com

*Attorneys for Defendants*

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT

## <u>STATEMENT OF THE ISSUES</u>

1.  In light of the Supreme Court's recent decision in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), are defendants entitled to summary judgment in their favor given the absence of any explicit language in the applicable collective bargaining agreement requiring the at-issue retiree healthcare benefits to be treated as vested for the lives of retirees?

    Defendants would respond:  Yes.
    Plaintiffs would respond:    No.


2.  In light of *Tackett*, are defendants entitled to summary judgment in their favor even if there is an ambiguity as to the duration of the at-issue retiree healthcare because the plaintiff retirees have received healthcare benefits for at least 9 years – a more than reasonable time?

    Defendants would respond:  Yes.
    Plaintiffs would respond:    No.

## <u>CONTROLLING AUTHORITY FOR RELIEF SOUGHT</u>

- *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015)

- *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 1

        A.      Relevant Parties And Entities. ............................................................... 1

        B.      Retiree Insurance And Relevant Contract Language. ............................ 2

                1.      The Supplement C-1 Insurance Program. ................................... 3

                2.      The Supplement C Agreement. .................................................... 4

        C.      Jackson Plant Closing And Termination Of The CBA. .......................... 6

        D.      Post-Closing Changes In Retiree Health Insurance. .............................. 6

        E.      Medicare Changes. ................................................................................. 7

        F.      Kelsey-Hayes' Implementation Of The HRA Program. ......................... 8

                1.      The HRA Structure. ..................................................................... 8

                2.      The HRA Enrollment Process. ..................................................... 8

                3.      The HRA Reimbursement Process. .............................................. 9

III.    LAW AND ARGUMENT ................................................................................ 10

        A.      Tackett Has Fundamentally Changed Retiree Healthcare Vesting Principles
                In This Circuit. ..................................................................................... 10

                1.      Tackett Requires Abandonment Of Prior Sixth Circuit Precedent. ................... 10

                2.      Following Tackett, Vesting Now Must Be Established By
                        Unequivocal Language In A Collective Bargaining Agreement. ........................ 12

        B.      Tackett Requires Summary Judgment In Defendants' Favor. ............... 14

                1.      Sprague Governs This Case And Is Fatal To Plaintiffs' Claims. ........................ 14

                2.      Plaintiffs' Retiree Healthcare Rights Were Not Explicitly Excluded
                        From The Relevant Durational Provisions. ............................................. 15

                3.      Plaintiffs Were Provided With Group Insurance For A Reasonable
                        Period. ............................................................................... 17

IV.     CONCLUSION ............................................................................................... 17

I.    **INTRODUCTION**

The Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), requires summary judgment in defendants' favor.  For more than thirty years, this Circuit's *Yard-Man* approach governed the issue of whether collectively bargained retiree healthcare rights should be treated as vested.  Disregarding bargained-for durational clauses and a number of other contract principles, *Yard-Man* placed a heavy  "thumb on the scale" in favor of vested benefits while purporting to rely on what it described as ordinary contract principles.

*Tackett* rejected this analysis and rejected, in detail, any notion that the Sixth Circuit's prior holdings could be justified under settled contract law.  Under the unanimous  *Tackett* decision, collectively bargained retiree healthcare benefits expire with the agreement in which they are created unless the contract expressly provides for an intent to vest.  Durational clauses in CBAs and companion insurance programs must be given full effect.  Moreover, even where the intended duration of retiree benefits is ambiguous, a court must apply a presumption *against* lifetime benefits, absent specific language to the contrary.  Notably, the Sixth Circuit has already adopted these principles outside of the collective bargaining context, in retiree benefit cases such as *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc).

Applying *Tackett* and *Sprague* here, the durational clauses and ordinary contract interpretation require that judgment be entered in defendants' favor.

II.    **STATEMENT OF FACTS**

    A.    **Relevant Parties and Entities.**

The Jackson, Michigan plant from which this case arose manufactured automotive brake systems until it closed in July 2006.  (Doc. 37-2, ¶ 7, Pg ID 1436, Declaration of Shelly Iacobelli). The Union, after merging with other unions in the 1990's, represented the production and maintenance workers at the Jackson facility.  (*Id.*).  TRW Inc. (which is not a party to this case) was the ultimate parent corporation of Kelsey-Hayes from 1999 until 2002, when TRW Inc. ceased operation.  (*Id.* ¶ 19, Pg ID 1438).

Defendant TRW Automotive Holdings Corporation ("Holdings") is the present-day ultimate parent entity of Kelsey-Hayes that first went public in 2004. (Doc. 37-2, ¶ 18, Pg ID 1438, Declaration of Shelly Iacobelli). There is no evidence of any historical relationship with or continuity from the prior, now-defunct TRW Inc. Defendant TRW Automotive Inc. is a wholly owned-subsidiary of Holdings. (*Id.* ¶ 19, Pg ID 1438).

Plaintiff Strait worked for Kelsey-Hayes at the Jackson plant from January 3, 1966 until he retired in July, 1999. (Doc. 37-10, Pg ID 1937, Deposition of Ronald Strait). Plaintiff Stevens worked at the Jackson plant from September 12, 1966 until his retirement on March 1, 1999. (Doc. 37-11, Pg ID 1970, Deposition of Danny O. Stevens). Both plaintiffs retired under the collective bargaining that went into effect on February 10, 1999. (Doc. 37-10, Pg ID 1937; Doc. 37-11, Pg ID 1970). Neither of the TRW defendants was even in existence at that time.

**B.**     **Retiree Insurance And Relevant Contract Language.**

The Jackson employees were covered by a series of collective bargaining agreements ("CBAs"), the last of which was negotiated in 2003. (Doc. 37-2, ¶ 7, Pg ID 1434, Declaration of Shelly Iacobelli). The Jackson CBA contained the following termination provision:

> **Article XIX**
> **TERMINATION**
>
> This Agreement entered into the 10th day of February, 2003 shall continue in full force and effect without change until February 11, 2007, 11:59 P.M.

(Doc. 37-3, Pg ID 1489, 2003 CBA).

Though incorporated into the various CBAs over the years, the insurance benefits negotiated for the bargaining unit were separately governed by two interrelated documents referred to as "Supplement C" and "Supplement C-1." (*Id.;* Doc. 37-8, Supplement C and Supplement C-1). That provision contained yet a *second* durational clause:

> **Section 11.      Duration Of Agreement**
>
> This Agreement [*i.e.*, Supplement C] and Program [*i.e.*, Supplement C-1] shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

(*Id.* at Pg ID 1876).

## 1.      The Supplement C-1 Insurance Program.

Supplement C-1 was largely a benefits schedule describing the various insurance coverages available to bargaining unit members and retirees, such as life, sickness and accident, health care, and other such benefits.  (Doc. 37-8, Supplement C and Supplement C-1).  Retiree coverage was referenced in Supplement C-1, Article II, Subsection (b)(7)-(8):

> **Section 3(b)(7).   For Retired Employees and Certain Former Employees**
>
> The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5, for:
>
> (i) A retired employee and his eligible dependents . . . provided such retired employee is eligible for benefits under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan . . .

> **Section 3(b)(8).  For Surviving Spouses**
>
> (i) The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 6(b) on behalf of a surviving spouse . . . and the eligible dependents of any such surviving spouse . . .

(*Id.* at Pg ID 1879).  While the Supplement C-1 retiree coverage was comprehensive, retirees still experienced some out-of-pocket costs.  For example, lifestyle drugs (*i.e.*, Viagra) and premium medical products (*i.e.*, wheelchairs and hearing aids) were not covered.  (Doc. 37-2, ¶ 11, Pg ID 1436, Declaration of Shelly Iacobelli). Routine office visits were also excluded.  (*Id.*).  Moreover, Medicare-eligible retirees paid their Medicare Part B premiums out-of-pocket.  (Doc. 36-2, ¶ 13, Pg ID 910, Declaration of Shelly Iacobelli).

Kelsey-Hayes retained flexibility under Supplement C-1 to modify retiree health benefits. (Doc. 37-8). Article III, Section 5, for example, described retiree benefits in terms of *coverage*, and did not require any particular plan or structure:

> **Article III, Section 5.  Continuance of Health Care Coverages Upon Retirement or Termination of Employment at 65 or Older**
>
> (a) The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle the employee to a benefit under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan shall be continued thereafter provided that suitable arrangements for such continuation, can be made with the carrier(s).  Contributions for such coverages so continued shall be in accordance with Article I, Section 3(b)(7).

(*Id.* at Pg ID 1901).  Article I, Section 5, Subsection (h) specifically acknowledged Kelsey-Hayes' right to change the "arrangement" through which the Supplement C-1 coverages were delivered:

> **ARTICLE III**
> **HEALTH CARE BENEFITS**
>
> **Section 1.  Establishment of Health Care Coverages**
>
> (h)  Replacement or Supplementation of Plan Coverages
>
> If, in its judgment the Company considers it advisable in the interest of the employees, another arrangement may be substituted for all or part of the coverages referred to in subsection (a) above.

(*Id.* at Pg ID 1898).

### 2.  The Supplement C Agreement.

Supplement C, on the other hand, was a "wrap around" document that incorporated the Supplement C-1 schedule into a formal, collectively bargained agreement between Kelsey-Hayes and the Union.  Supplement C furthermore defined the specific terms of Supplement C-1's incorporation.  For example, Supplement C provided a commitment from Kelsey-Hayes to

4

provide the benefits described in Supplement C-1 or, if such benefits proved impractical, to negotiate with the Union for a substitute benefits package:

| |
|---|
| **Section 1.     Establishment of Program** |
| In the event the initiation of any benefit or benefits described in Article III of the Program [*i.e.*, Supplement C-1] does not prove practicable or is not permitted by the plans under which coverages provided on the dates stipulated in such Article III, the Company in agreement with the Union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided. |

(Doc. 37-8, Pg ID 1873, Supplement C and Supplement C-1).

Kelsey-Hayes further agreed in Supplement C to limit its modification rights established in Supplement C-1.  In particular, the Company agreed that it would seek the Union's consent prior to exercising these rights:

| |
|---|
| **Section 3.  Company Options** |
| (a) The options afforded the Company to provide a plan of benefits supplementary to state plan benefits or to substitute a private plan of benefits for state plan benefits as provided in Section 4(a) and 4(b) respectively, in Article I of the Program shall not be exercised except by mutual agreement between the Company and the Union. |
| (b) The option afforded the Company to provide a plan of benefits supplementary to the Federal Benefits or to substitute a plan of benefits for the benefits provided by the Federal Laws as provided in Sections 5(a) and 5(b) respectively, in Article I of the Program shall not be exercised except by mutual agreement between the Company and the Union. |
| (c) The options afforded the Company to select plans as provided in Article III of the Program shall be exercised only by mutual agreement between the Company and the Union. |

(*Id.* at Pg ID 1874).

**These limitations, including the requirement to seek the Union's consent prior to any changes, were not permanent**.  As noted above, Supplement C was expressly made subject to the contract's general termination clause, describing its "duration" as continuing only "until the termination of the Collective Bargaining Agreement of which this is a part."

C.      **Jackson Plant Closing And Termination Of The CBA.**

On September 30, 2005, Kelsey-Hayes entered into a Plant Shutdown Agreement with the Union in its capacity as the bargaining representative.  (Doc. 37-8, Plant Shutdown Agreement).  TRW Automotive also signed the closing agreement as the parent of Kelsey-Hayes.   (*Id*.).  The closing agreement specified that the Jackson CBA would terminate with the cessation of production at the facility:

> Except as modified by this Plant Shutdown Agreement, the Collective Bargaining Agreement between the parties dated February 10, 2003, is extended and shall remain in effect until production ceases at the facility.

(Doc. 37-9, Pg ID 1932, Plant Shutdown Agreement).  In other words, the shutdown agreement contained yet a *third* general durational clause.  Production at the Jackson facility terminated in July 2006.  (Doc. 37-2, ¶ 7).

D.      **Post-Closing Changes In Retiree Health Insurance.**

Since the Jackson plant closed and the collective bargaining agreement expired, retirees have experienced a number of changes in their health insurance coverage.  (Doc. 36-2, ¶ 8, Pg ID 908, Declaration of Shelly Iacobelli).  For 2007, Kelsey-Hayes changed the insurance carrier from Blue Cross Blue Shield of Michigan to Meritain.   (*Id*.).  In 2009, Kelsey-Hayes changed the insurance carrier again, switching from Meritain to Humana, Inc.  (*Id*.).   These changes were accompanied by changes in coverage, in networks and/or in the insurance process.  (Doc. 37-11, Pg ID 1974, Deposition of Danny O. Stevens (acknowledging 2008 change to Blue Cross Shield)).

For example, when Humana became the carrier in 2009, all eligible retirees were required to enroll in Medicare Parts A and B if they had not already done so, and to pay Part B premiums of nearly $1,200 per year.  (Doc. 36-2, ¶ 9, Pg ID 908, Declaration of Shelly Iacobelli).  This process also required all participating retirees to re-enroll in the health plan if they wished to continue their coverage, which was a fairly lengthy and complex process.  (*Id*.).  To take advantage

of the most generous coverage, some retirees had to select a new doctor or doctors because their prior physicians did not participate in Humana's network.  (*Id.*).

> **E.** **Medicare Changes**.

During this same timeframe, Congress was enacting a series of provisions to protect purchasers of so-called "Medigap" plans, *i.e.*, insurance plans to cover varying portions of expenses excluded by Medicare Parts A and B.  These protections included restrictions on preexisting condition exclusions, the sale of duplicative coverage, and various other issues.  *See* 42 U.S.C. §§ 1395c-1395i5; 1395j-1395w5.

Congress also adopted a standardized set of Medigap plans to be offered by private insurers, which were each identified by a letter (*i.e.*, Supplemental Plan A, Supplemental Plan B, *etc.*)  *See* 42 U.S.C. § 1395s5; 42 C.F.R. part 403.  The most popular of these plans is Supplemental Plan F, which covers virtually all co-payments and deductibles excluded by Medicare.  (Doc. 37-2, ¶ 21, Pg ID 1440, Declaration of Shelly Iacobelli).  Thus, an individual covered by Medicare Parts A and B, along with a Plan F Medigap policy has virtually no out-of-pocket costs.  (*Id.*).

On January 1, 2006, Medicare Part D added prescription drug coverage for Medicare recipients.  *See* 42 U.S.C. § 1395w-101.  Because Medicare Parts A and B already covered hospitalization and outpatient services respectively, the introduction of Part D prescription drug coverage made retiree health care costs significantly more manageable.  (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli).  As a result, Medigap plans became more cost-effective. (*Id.*).  Further, as commercial insurance carriers entered the market, the supplemental plans began offering nationwide pools that cost, per retiree, as little as half or even less than half of what Kelsey-Hayes was paying in the past for the Jackson retirees.  Tax-free HRAs also became available to pay the cost of such coverage.  (*Id.*).

**F.      Kelsey-Hayes' Implementation Of The HRA Program.**

**1.      The HRA Structure.**

As a result of these changes, Kelsey-Hayes was able to provide Medicare-eligible retirees (including those from the Jackson plant) with better, more flexible coverage at a significant cost savings.  (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli).  To that end, in September 2011, Kelsey-Hayes announced that it was establishing Health Reimbursement Accounts, or "HRAs," for retirees over the age of 65 and their eligible dependents.  (*Id.*).  Kelsey-Hayes funded each participant's account with an initial contribution of $15,000 in 2012, and an additional contribution of $4,800 in 2013.  (*Id.*).[1]

Using these Company-provided HRA funds, retirees were able to purchase individual health insurance policies from selected carriers.  The available plans included Medigap coverage, Medicare Part D prescription coverage, and Medicare Advantage plans (which essentially bundle Medicare Parts A, B and, in most cases, D coverage together with Medigap coverage into a single, private insurance plan).  (Doc. 37-2, ¶ 11, Pg ID 1436, Declaration of Shelly Iacobelli).   These plans were offered by some of the largest health insurance carriers in the United States, including AARP, Blue Cross, Aetna, Humana, Anthem, Cigna, and UnitedHealthcare.  (Doc. 37-2, ¶ 12, Pg ID 1438 Declaration of Shelly Iacobelli).  Overall, the retirees were able to select the best coverage for their needs from dozens of options.  (*Id.* at ¶ 11, Pg ID 1438).

**2.      The HRA Enrollment Process.**

To help Jackson retirees identify the best plan for their needs, Kelsey-Hayes retained Extend Health, a company that specializes in assisting Medicare-eligible individuals with the selection of supplemental insurance.  (Doc. 36-2, ¶ 11, Pg ID 909, Declaration of Shelly Iacobelli).  Each retiree had the opportunity for a one-on-one discussion with an Extend Health representative.  (Doc. 37-2, ¶ 11, Pg ID 1436, Declaration of Shelly Iacobelli).  Prior to the

---

[1] Pursuant to the Court's April 24, 2013 Order, all retirees where placed back in the TRW group health plan effective July 2013.  Despite the Sixth Circuit's reversal, to date Kelsey-Hayes has kept the retirees in this plan pending the conclusion of this litigation.

discussion, the retiree was asked to complete a single-sheet enrollment questionnaire that requested little more than a list of the retirees' doctors (to identify the right provider network), and a list of prescriptions the retiree was taking (to identify the right drug plan).  (Doc. 37-16, Enrollment Form).  Notably, this form was far simpler than Medicare's own approved claim form. (Doc. 37-17, Medicare Claim Form).

Retirees remained free to select any plan they wished from those that were offered.  (Doc. 37-2, ¶ 12, Pg ID 1437, Declaration of Shelly Iacobelli).  For example, retirees who wished to replicate (or even exceed) their prior coverage were able to select a Supplemental Plan F and prescription drug plan at a cost of approximately $215 per month.  (*Id*).  Alternatively, retirees who wished to pay lower premiums had the ability to select from plans with small deductibles and/or co-pays (which were also reimbursable from HRA funds).  (*Id*).

In addition to payment of insurance premiums, retirees were able to use HRA funds for **any** eligible medical expenses.  (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli).  This included reimbursement for premium medical equipment, Medicare Part B premiums, out-of-network medical care, non-covered procedures and/or prescription drugs, and a number of other expenses that retirees previously paid from their own pockets.  (*Id*.).  Any HRA funds that remained unused rolled over into the next year.  (Doc. 39-19, Pg ID 2675, 2012 New Coverage New Choices Booklet.).

### 3.   The HRA Reimbursement Process.

After selecting an insurance plan, retirees paid premiums directly to the insurance carrier. They also paid for any medical costs that were not covered by the insurance plan they selected. The retirees then submitted proof of such payments to Extend Health, and Extend Health reimbursed them from their HRA accounts.  (Doc. 37-11, Pg ID 1979, Reimbursement Form). While this process was painless to begin with, it was further simplified by the fact that the vast majority of insurance policies allowed for automated premium payment and reimbursement. (Doc. 37-11, Pg ID 1977, Deposition of Danny O. Stevens).

The funds that Kelsey-Hayes provided in the HRAs for Jackson retirees were more than sufficient to cover the retirees' expenses. Through all of 2012, the first full year of the HRA program, no Jackson retiree exhausted his or her funds. (Doc. 37-2, ¶ 14, Pg ID 1437, Declaration of Shelly Iacobelli). In fact, single Jackson retirees had an average of $13,133.63 in remaining HRA funds. (*Id.*). Married Jackson retirees had an average of $25,146.11. (*Id.*).

## III.   LAW AND ARGUMENT

### A.   *Tackett* Has Fundamentally Changed Retiree Healthcare Vesting Principles In This Circuit.

#### 1.   *Tackett* Requires Abandonment Of Prior Sixth Circuit Precedent.

Rejecting two of *Yard-Man*'s most basic principles and dismissing a third, *Tackett* adopted the inverse analysis. First, while Yard-Man and its progeny claimed to be relying on ordinary contract law principles, the Supreme Court in great detail explored that claim and found that in fact the Sixth Circuit holdings had actually disregarded any such law.

Second, and perhaps most important, *Tackett* rejected *Yard-Man*'s discounting of contractual duration clauses. Under *Yard-Man*, courts in this Circuit were required to presume that general contract duration clauses were insufficient to terminate retiree healthcare rights. Instead, courts looked for language in the collective bargaining agreement that specifically authorized the employer to terminate retiree benefits. Over time, the Sixth Circuit begain to reject not only general contract clauses, but also clauses that applied to all insurance benefits. In the absence of a specific authorization, the *Yard-Man* approach essentially dictated a finding that the benefits were vested. *E.g.*, *Noe v. PolyOne Corp.,* 520 F.3d 548, 568 (6th Cir. 2008) ("[u]nless a company can point to explicit language in the relevant agreement stating that 'retiree benefits terminate at a particular date or do not vest, the benefits seem to vest as a matter of law."); *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 413 (E.D. Mich. 1994), *aff'd*, 73 F.3d 648 (6th Cir. 1996) (describing *Yard-Man* as creating an "inference of interminable benefits absent express language to the contrary"); *see also Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 581 (6th Cir. 2006) (same); *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir. 2000).

10

*Tackett* reverses this analysis.  Contract duration clauses must be presumed to apply to *all* contractual obligations, including retiree healthcare.  All such obligations must be presumed to end upon termination of the contract unless the contract specifically provides otherwise.  *Tackett*, *Tackett*, 135 S. Ct. at 936.  Thus, in contrast to *Yard-Man*'s requirement that retiree benefits survive absent a specific authorization to terminate, *Tackett* now requires that retiree benefits terminate absent specific language allowing them to survive.

The third foundational principle rejected in *Tackett* pertains to the impact of alleged contractual ambiguities.  *Yard-Man* and its progeny held that such uncertainties should be viewed with a "thumb on the scale" in favor of vesting.  Rejecting this notion, *Tackett* espoused the opposite principle.  *Tackett*, 135 S. Ct. at 935.  The Court held that, when an ambiguity exists as to the duration of retiree health benefits, lifetime vesting must be *disfavored*.  *Id.* at 936.  Instead, benefits should be presumed to last only for a "reasonable time."  *Id.*

The *Yard-Man* principles discarded in *Tackett* were incorporated, though sometimes tacitly, into this Circuit's entire body of precedent concerning retiree healthcare vesting.  Even in decisions that did not cite *Yard-Man* expressly, contractual duration clauses were ignored and the inference in favor of vesting was applied. Accordingly, these decisions now have no precedential value, and should not inform the Court's analysis in this case.

Plaintiffs, however, will likely seek to minimize *Tackett*'s significance and its impact on the *Yard-Man* analysis. Aside from rejecting *Yard-Man's* presumption in favor of vesting, plaintiffs may argue that *Tackett* simply requires a court to apply "ordinary principles of contract law."  Because *Yard-Man* and its progeny claimed to rely on "ordinary contract principles," plaintiffs may contend that these cases remain good law.

Plaintiffs' arguments cannot be reconciled with *Tackett*'s holding.  While acknowledging that the Sixth Circuit claimed to follow ordinary contract law, the Supreme Court painstakingly reviewed the various respects in which the Sixth Circuit's *Yard-Man* analysis conflicted with such principles.  *Tackett*, 135 S. Ct. at 933.  Specifically, the Supreme Court found that the Sixth Circuit

repeatedly ignored collectively bargained durational clauses, misconstrued the presumption against illusory promises, found vested lifetime benefits without express language in the underlying agreement, and committed a host of other such errors. *Id.* at 934-35. These flaws were *in addition* to the Sixth Circuit's impermissible "thumb on the scale." Any attempt to revive *Yard-Man* or its progeny as having followed any such principles therefore must fail.

## 2.   Following *Tackett*, Vesting Now Must Be Established By Unequivocal Language In A Collective Bargaining Agreement.

In rejecting *Yard-Man*, the Supreme Court also supplied guidance on what should replace it. *Tackett* permits a finding of vested benefits **only** if the relevant collective bargaining agreement explicitly excludes retiree healthcare from the contract's general termination clause. *Id.* Contractual provisions stating that benefits "will continue" are no longer sufficient to confer vested benefits or ignore the contract's expiration. *Tackett*, 135 S. Ct. at 934-5 (criticizing the holding of *Policy v. Powell Pressed Steel Co.*, 770 F. 2d 609, 615 (6th Cir. 1985), which construed the language "will continue to provide at its expense, supplemental Medicare and major medical benefits for Pensioners aged 65 and over" to "unambiguously confe[r]" lifetime benefits).

The Court specifically identified the Sixth Circuit's opinion in *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (*en banc*), as an example of the proper approach. In *Sprague*, the Sixth Circuit recognized that Congress specifically exempted ERISA welfare plans from the vesting requirements to which pension plans are subject. 29 U.S.C. § 1051(1). Accordingly, the Court found, "an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest 'must be found in the plan documents' and must be stated in 'clear and express language.'" *Id.* at 400. *Tackett* embraced these same principles, *i.e.*, that benefit obligations ordinarily cease upon termination of the labor agreement, and that a clear manifestation of contrary intent is required to find vesting. *See Tackett*, 135 S. Ct. at 936-7. These principles must now be applied in the collective bargaining context in accordance with *Tackett*, just as they have been in the non-union context under *Sprague*.

Other appellate courts have employed reasoning similar to *Tackett* and *Sprague*. For example, in *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir. 2006), the employer and the union bargained a separate insurance agreement that included retiree healthcare. The insurance agreement provided that it would remain in effect "during the period of [the collective bargaining agreement]." *Id.* at 479. The plaintiff retirees alleged that the insurance agreement provided them with a vested right to healthcare based on a clause that offered benefits to surviving spouses "until their death or remarriage." *Id.* at 483.

Rejecting this argument, the Seventh Circuit espoused the presumption set forth in *Tackett* that benefits terminate with the CBA. *Id.* at 481. The court found that the "during the period of this agreement" phrase required the conclusion that, "when the [agreement] ceased to be effective, 'lifetime benefits' ceased as well." *Id.* Addressing the retirees' argument based on the promise of benefits "until death," the court explained that this provision "refer[red] to the eligibility of individuals to receive benefits under the agreement, not to the *duration of the agreement*." *Id.*

Similarly, in *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1999), the union and the employer negotiated a series of Group Insurance Agreements ("GIAs"). *Id.* at 132. The GIAs each provided that the terms and conditions would "continue in effect" until a particular date. *Id.* In regard to retiree healthcare, the GIAs stated that such benefits would "be provided for employees receiving or becoming entitled to receive pension payments" and would terminate if and when a retiree: (1) became covered under another group policy; (2) moved to a foreign country; or (3) died. *Id.* at 134. Citing *Sprague*, the Second Circuit held that this language failed as a matter of law to establish a vested right to retiree healthcare. 171 F.3d 130, 134.

In *UAW v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999), the plaintiff retirees alleged that the CBA expressed a clear intent to vest retiree healthcare benefits for life based on language providing that such benefits "will continue" and "shall remain." While the CBA had a general durational clause providing that the CBA would continue until a date certain, there was no specific expiration date on the insurance program. *Id.* at 136. In an opinion joined by then-Judge Samuel

Alito, the Third Circuit held that "the phrases, 'will continue' and 'shall remain,' certainly [do] not unambiguously indicate that the benefits will continue ad infinitum." *Id.* at 141. The court found that a more "reasonable" contractual interpretation was that "the benefits 'will continue until the CBA expires,' or that they 'shall remain . . . until the CBA expires.'" *Id.*

    **B.**    ***Tackett* Requires Summary Judgment In Defendants' Favor.**

Plaintiffs' claims in this matter cannot survive the *Tackett* analysis. The relevant insurance agreement tied itself directly to the durational clause of the Jackson CBA. There is no language that explicitly excludes retiree healthcare benefits from the scope of that provision. Even setting aside the absence of such language, none of the agreements contain language characterizing retiree health insurance as a "lifetime" benefit. Thus, in accordance with *Tackett* and *Sprague*, summary judgment should be entered in defendants' favor.

    **1.**    ***Sprague* Governs This Case And Is Fatal To Plaintiffs' Claims.**

This case is disposed of by the Sixth Circuit's holding in *Sprague*. As explained above, the language at issue in *Sprague expressly* provided that retirees would receive insurance coverage "for life." Yet, the Sixth Circuit still held that such language could not overcome the employer's reservation of the right to terminate this coverage. *Sprague*, 133 F.3d at 401. Notably, contractual duration provisions are identical in operation to the reservation of rights clause relied upon by the Sixth Circuit in *Sprague*. *See Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 484 (7th Cir. 2006)

The agreements at issue in this case provide even less support for a finding of lifetime benefits than the language rejected in *Sprague*. Neither the Jackson CBA nor its supplements required benefits "for life" or other such language. To the contrary, Supplements C and C-1, which outlined the benefits to be provided to retirees and other individuals, incorporated the termination date of the Jackson CBA. By their express terms, Supplements C and C-1 were in effect only "until the termination of the Collective Bargaining Agreement." ( Doc. 37-8, Pg ID 1876, Supplement C and Supplement C-1). Consistent with *Tackett*'s admonition that contractual

duration clauses must be presumed to cover all contractual obligations and benefits, this language should be read to apply to the Jackson retirees' healthcare benefits.

> ## 2.    Plaintiffs' Retiree Healthcare Rights Were Not Explicitly Excluded From The Relevant Durational Provisions.

In light of the durational provisions of the Jackson CBA and the insurance supplements, Plaintiffs can only survive summary judgment if they identify contract language that "provide[s] in explicit terms that [such benefits] continue after the agreement's expiration." *Tackett*, 135 S. Ct. at 937; *Sprague*, 133 F.3d at 401 (same).  They are unable to do so.

Presumably, plaintiffs will continue to rely upon contract language providing that health insurance would be "continued" for Jackson retirees and that the Company would "contribute the full premium or subscription charge." (Doc. 37-8, Supplement C and Supplement C-1 at Page ID 1879, 1901). Based on their past arguments, plaintiffs will likely insist that this language "unambiguously" demonstrates the parties' intention to create vested benefits that would continue beyond the Jackson CBA's expiration.  But, plaintiff's heavy reliance on pre-*Tackett* case law from this Circuit is telling in regard to the true substance of their contention.  Regardless of how they characterize it, plaintiffs' argument is actually based on the notion that similar language—when combined with *Yard-Man*'s presumption in favor of vesting—was *previously* sufficient to bestow lifetime benefits.

The *Yard-Man* presumption is defunct following *Tackett*, however, and the case law upon which plaintiffs rely and their now bankrupt analysis is no longer valid.  With the *Yard-Man* inference and the gloss of its progeny stripped away, the "will continue" and "full premium" language is not an "explicit" recognition "that [retiree benefits] continue after the agreement's expiration."  *Tackett*, 135 S. Ct. at 937; *Sprague*, 133 F.3d at 401 (same).  Rather, this language is more appropriately interpreted as requiring Kelsey Hayes to "continue" its payment of the "full premium" for retiree healthcare *during the term of the Jackson CBA* only.

15

The failure of plaintiffs' argument in this regard is confirmed by the *Tackett* majority's specific rejection of *Policy v. Powell Pressed Steel Co.*, 770 F. 2d 609, 615 (6th Cir. 1985). *Tackett*, 135 S. Ct. at 934-5. In *Policy*, the Sixth Circuit held that language providing that the employer would "continue to provide" retiree healthcare "unambiguously confe[rred]" lifetime benefits. In identifying *Policy* as an example of *Yard-Man*'s unwarranted expansion, the Supreme Court noted that the Sixth Circuit had earlier found similar language to be ambiguous. 135 S. Ct. at 934-5. The *Policy* language is identical in all relevant respects to the language upon which plaintiffs will likely rely here. Plaintiffs cannot rely on such language because the Supreme Court has indicated that it does not support vesting.

As explained above, other courts have similarly recognized that "will continue" and "full premium" provisions do not suggest lifetime benefits. Now-Justice Alito and the Third Circuit rejected virtually *identical* language in *UAW v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999). Citing the Sixth Circuit's decision in *Sprague*, the Third Circuit recognized in *Skinner* that "[a] plain reading of the phrases, 'will continue' and 'shall remain,' certainly does not unambiguously indicate that the benefits will continue *ad infinitum*." *Id.* at 141. The court further recognized such wording was more reasonably interpreted as requiring that "the benefits 'will continue until the CBA expires,' or that they 'shall remain . . . until the CBA expires.'" *Id.*; *see also Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 483 (7th Cir. 2006) (contractual duration clause trumped a provision that provided retiree benefits to surviving spouses "until their death or remarriage"); *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 134 (2d Cir. 1999) (retiree benefits expired with underlying CBA despite language requiring such benefits to continue until retiree's death).

Finally, to the extent any tension existed between the "will continue" and "full contribution" language in Supplement C-1 and the durational language set forth in Supplement C, the parties expressly agreed that the terms of Supplement C would "supersede the provisions of [Supplement C-1] to the extent necessary to eliminate such conflict." (Doc. 37-8, Pg ID 1873, Section 1). The Supreme Court has found that even one durational clause limits retiree benefits;

this contract had two, one of which when above and beyond *Tackett* by limiting insurance benefits. *Tackett* and these durational clauses dictate a judgment for the defendants.

### 3.   Plaintiffs Were Provided With Group Insurance For A Reasonable Period.

Finally, even if plaintiffs were able to demonstrate that their benefits should survive the Jackson CBA's expiration, defendants would still be entitled to summary judgment. A contractual benefit that survives expiration but is not subject to specific durational language should be construed to last only for a reasonable period. *Tackett*, 135 S. Ct. at 936 ("contracts that are silent as to their duration will ordinarily be treated not as 'operative in perpetuity' but as 'operative for a reasonable time.'")  As the Supreme Court recognized in *Tackett,* a finding of lifetime benefits in these circumstances should be *disfavored. Id.*

Here, the plaintiff retirees all retired from the Jackson plant under the 1995, 1999 or 2003 collective bargaining agreements.  (Doc. 58, p. 3, Certificatio Order).  They were provided with a fully paid, group health insurance plan for at least *11 years* after the last CBA expired and 8 years after the Jackson plant closed.  (*See* Doc. 1, ¶¶ 10-11, Complaint).  This coverage bridged the retirees to Medicare, after which time Kelsey Hayes has continued to provide fully paid Medicare supplemental insurance by reimbursement through the HRA structure.  The HRA structure was in place for less than two years before, per the Court's April 2013 Order, Kelsey Hayes placed the Jackson retirees back into the fully paid, group health insurance plan.  The retirees have remained in this plan since, despite the subsequent remand ruling from the Sixth Circuit.

Thus, plaintiffs have received healthcare benefits for more than a "reasonable time" after the CBA was terminated.  Consequently, defendants would be entitled to summary judgment even if there was an ambiguity in the CBA as to the duration of retiree healthcare benefits.

## IV.   CONCLUSION

*Tackett* requires the vesting question to be decided by interpreting all contract provisions—including durational clauses—according to their terms in strict adherence to normal contract

principles. This rubric is fatal to plaintiffs' claims in light of the fact that the agreements describing their retiree healthcare benefits (Supplements C and C-1) were expressly made subject to the Jackson CBA's expiration. While it is debatable whether the "will continue" and "full premium" language upon which plaintiffs rely should have been sufficient to create vested benefits under the *Yard-Man* approach, *Tackett*'s rejection of *Policy* now forecloses any argument in this regard. Plaintiffs therefore cannot rebut the presumption that their healthcare rights expired with the Jackson CBA, and their claims must fail as a matter of law.

Respectfully submitted,

s/ Gregory V. Mersol
GREGORY V. MERSOL (0030838)
GMERSOL@BAKERLAW.COM
TODD A. DAWSON (0070276)
TDAWSON@BAKERLAW.COM
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, Ohio 44114-3485
Telephone:      (216) 621-0200
Facsimile:      (216) 696-0740

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2015, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ Gregory V. Mersol
One of the Attorneys for *Defendants*