UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, ALF-
CIO-CLC; AND RONALD STRAIT AND
DANNY O. STEVENS, FOR THEMSELVES
AND OTHERS SIMILARLY SITUATED,

    Plaintiffs,

     v.

KELSEY-HAYES COMPANY; TRW
AUTOMOTIVE, INC.; AND TRW
AUTOMOTIVE HOLDINGS
CORPORATION,

    Defendants.

_____/

Case No. 4:11-CV-15497

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

**OPINION AND ORDER DENYING DEFENDANTS' RENEWED MOTION FOR SUMMARY
JUDGMENT [100] AND GRANTING PLAINTIFFS' MOTION TO REAFFIRM PRIOR
GRANT OF SUMMARY JUDGMENT AND PERMANENT INJUNCTION [101]**

**I. INTRODUCTION**

On December 15, 2011, Ronald Strait and Danny O. Stevens, along with

their union, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers International, AFL-CIO-CLC (collectively,

"Plaintiffs"), filed a case action suit against Kelsey-Hayes Company, TRW

Automotive, Inc., and TRW Automotive Holdings Corporation (collectively,

-1-

"Defendants"), alleging breach of their collective bargaining agreement (CBA) under Section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185, and a breach of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Dkt. No. 1. On March 18, 2013, the Court granted class certification. Dkt. No. 58.

The Court granted Plaintiffs' Motion for Summary Judgment and denied Defendants' Motion for Summary Judgment on April 24, 2013. Dkt. No. 65. One year later, the Sixth Circuit affirmed the Court's judgment. Dkt. No. 90. On July 28, 2015, the Sixth Circuit vacated its opinion and remanded the case back to district court for reconsideration in light of the Supreme Court's decision in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015). Dkt. No. 97.

This matter is before the Court on Defendants' Renewed Motion for Summary Judgment. Dkt. No. 100. Plaintiffs filed a Brief in Support of Reaffirmation of Summary Judgment and Permanent Injunction. Dkt. No. 101. These matters are fully briefed and the Court concludes that oral argument will not aid in their resolution. Accordingly, pursuant to E.D. Mich. L.R. 7.1(f)(2), these matters will be resolved on the briefs. For the reasons discussed below, the Court will deny Defendants' Motion and will reaffirm its prior award of summary judgment to Plaintiffs.

## II. BACKGROUND

Plaintiffs Strait and Stevens represent a class of retirees who worked at the Kelsey-Hayes manufacturing plant in Jackson, Michigan, which closed in July 2006. Dkt. No. 37, p. 10 (Pg. ID No. 1411). Jackson plant employees were parties to a series of CBAs, the last of which was negotiated in 2003. *Id*. at 20 (Pg. ID No. 2182). The CBAs incorporated two supplements, Supplement C and Supplement C-1, to govern the negotiated insurance benefits. *Id*. The Supplements were "made part of [the CBAs] as if set out in full herein, subject to all provisions" of the CBAs. 1995 CBA, Art. XVII (Pg. ID No. 198).

Defendants provided the promised insurance coverage to retirees before and after the Jackson plant closed in 2006. Dkt. No. 39, p. 22 (Pg. ID No. 2184). Employees eligible for retirement at the time the plant closed were given the opportunity to accept a one-time cash payment, based on the individual's age and actuarial life expectancy, in return for permanently giving up the right to retirement healthcare. Dkt. No. 101, pp. 18–19 (Pg. ID No .6440–41).

On September 14, 2011, TRW Automotive wrote to Jackson plant retirees to announce a change in the health insurance program. Dkt. No. 39-18, p. 2 (Pg. ID No. 2666). The letter stated that TRW would establish individual health reimbursement accounts (HRAs), in place of the original retiree plan, effective January 1, 2012. *Id*. at 2–3. Retirees would be required to purchase individual

plans for Medicare supplemental insurance paid for, at least initially, by TRW's contributions to the HRAs. *Id.* at 3. TRW stated that it would provide a one-time contribution of $15,000 to the HRAs for each eligible retiree and eligible spouse for 2012 and $4,800 for 2013. *Id.* Under the new program, Defendants had sole discretion to decide whether or not to contribute to the retirees' HRAs as of 2014.

The September 2011 letter noted that "TRW's contribution to the HRA will be reviewed annually and is subject to change" and "TRW retains the right to amend or terminate the HRA." *Id.* TRW also provided retirees with a booklet, entitled "2012 New Coverage New Choices," that further addressed the change from the retirees' existing health insurance plans to HRAs. Dkt. No. 39-19. The booklet states, in relevant part:

> You are neither vested in your retiree healthcare benefits nor does TRW Automotive intend to vest you in retiree healthcare benefits. To the fullest extent permitted by law, TRW Automotive reserves the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA), in whole or in part, at any time and for any reason, by appropriate Company action. For example, TRW Automotive may, at any time, increase, decrease or eliminate the amount that is allocated to your HRA account each year.

*Id.* at 12 (Pg. ID No. 2680).

On January 1, 2012, Defendants discontinued group coverage insurance for eligible retirees and spouses, age 65 and older, and replaced it with the HRA

-4-

funding program. Dkt. No. 39, p. 23 (Pg. ID No. 2185). Under this program, Plaintiffs worked with Extend Health[1] to select the individual insurance plan from selected carriers. Plaintiffs were to pay their premiums directly to the insurance provider, and then submit their claims to Extend Health for reimbursement, provided their HRAs contain sufficient funds. *Id.* at 24.

Plaintiffs alleged that the change to HRAs meant that retirees bore the administrative and financial risks and responsibilities formerly borne by Defendants. *Id.* at 6. Additionally, Plaintiffs contended that the HRA program subjected them to time-consuming and frustrating administrative burdens, anxiety, and uncertainty. *Id.* Plaintiffs asserted that the unilateral modification of healthcare benefits was a breach of the 1995, 1999, and 2003 CBAs and a violation of federal labor policy and ERISA.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's*

---

[1] Extend Health is a subsidiary of Towers Watson, the firm which advised Defendants on the 2012 changes. Extend Health does not provide health benefits; rather it is authorized by certain carriers to sell their insurance plans. Extend Health receives commissions from the insurance carriers on every policy it sells to the retirees.

*Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

### A. The Supreme Court's *Tackett* Decision

There is a federal right of action for "violations of contracts between an employer and a labor organization representing employees" under section 301 of the LMRA. 29 U.S.C. § 185(a). A LMRA claim may also create a derivative ERISA claim, where "the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract." *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012). The central issue in this Court's reconsideration of the parties' motions for summary judgment, in light of *Tackett*, is whether the parties intended to vest lifetime, fully-funded healthcare benefits for Plaintiff retirees and eligible spouses.

The Supreme Court's decision in *Tackett* did not set forth new rules for interpreting collective bargaining agreements. Rather, *Tackett* ordered courts to "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." 135 S. Ct. at 933. In doing so, the Supreme Court rejected the *Yard-Man* inference that, in close cases, contract interpretation should favor vesting. *Tackett*, 135 S. Ct. at 935. Accordingly, in line with *Tackett*, the Court will rely on the ordinary principles of contract interpretation to determine whether the contracts in question created vested rights.

In the concurring opinion in *Tackett*, Justice Ginsburg clarified how courts were to apply ordinary contract principles:

> Under the "cardinal principle" of contract interpretation, "the intention of the parties, to be gathered from the whole instrument, must prevail." 11 R. Lord, Williston on Contracts § 30:2, p. 27 (4th ed. 2012) (Williston). To determine what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific "customs, practices, usages, and terminology." *Id*., § 30:4, at 55–58. When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further. *Id*., § 30:6, at 98–104. But when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties. *Id*., § 30:7, at 116–124.

*Id.* at 937–38 (Ginsburg, J., concurring). *Cf. Tackett v. M & G Polymers USA, LLC*, No. 12-3329, 2016 WL 240414, at *4 (6th Cir. Jan. 21, 2016) ("Reliance on Justice Ginsburg's concurrence is appropriate in this instance because it identifies other principles of contract law.").

Although Defendants argue that vesting must now be established by unequivocal, explicit language within the CBA, the Supreme Court did not adopt this standard in *Tackett*. Instead, the majority's reference to *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998), upon which Defendants rely, served merely to illustrate the inconsistencies within the Sixth Circuit's jurisprudence on employment contracts. *Sprague*, unlike the case at hand, did not involve collectively bargained agreements. "When a healthcare plan is not the product of collective bargaining, 'the intent to vest must be found in the plan documents and must be stated in clear and express language,' " whereas, plans resulting from collective bargaining are to be interpreted according to "ordinary principles of contract interpretation." *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (quoting *Sprague*, 133 F.3d at 400)). Thus, finding Defendants' proposed standard to be inapplicable, the Court will proceed with contract interpretation through the use of ordinary principles.

**B. The Collective Bargaining Agreements and Supplements C and C-1**

The Court's original award of summary judgment to Plaintiffs did not rely on any of the *Yard-Man* inferences found to be improper by the Supreme Court.[2] Nevertheless, to the extent that the Court relied on the Sixth Circuit's *Yard-Man* progeny, the Court reconsiders its prior ruling, as necessary, to ascertain parties' intent from the written agreements under ordinary principles of contract law.

**1.  Promises Regarding Healthcare**

Article XVII of the 1995 CBA provides that Supplement C and Supplement C-1 contain the full text of the agreement regarding the parties' insurance program. Dkt. No. 39-2, p. 54 (Pg. ID No. 2279). The 1995 Supplement C states, in relevant part:

> The Company will establish an amended insurance program, hereinafter referred to as the "Program," a copy of which is attached hereto as Supplement C-1 and made part of this Agreement . . . , however . . . [i]n the event any conflict between the provisions of the Program and the provisions of this Agreement, the provisions of this Agreement will supersede the provisions of the Program to the extent necessary to eliminate such conflict.

Dkt. No. 39-3, p. 4 (Pg. ID No. 747).

---

[2] The Court's original opinion and order quoted Yard-Man to note that " 'traditional rules for contract interpretation apply to the enforcement of collective bargaining agreements." Dkt. No. 65, pp. 8–9 (Pg. ID No. 4994–95). The *Yard-Man* quotes that followed merely summarized basic principles of contract interpretation, without use of the suspect inference. *See id*. at 9.

Supplement C-1 also addresses healthcare coverages and benefits. Supplement C-1 states that "Kelsey-Hayes Company will establish an Insurance Program either through a self-insured plan or under a group insurance policy or policies issued by an insurance company or insurance companies . . . as set forth in Articles II and III . . . ." Dkt. No. 39-4, p. 4 (Pg. ID No. 2324). Article III, Section 5, titled "Continuance of Health Care Coverages Upon Retirement or Termination of Employment at Age 65 or Older," subsection (a) provides:

> The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older . . . shall be continued thereafter provided that suitable arrangements for such continuation, can be made with the carrier(s).

*Id*. at 41 (Pg. ID No. 2361). Section 6 addresses the promise of "continuance" of healthcare for employees' and retirees' surviving spouses. *Id*.

In Article I, Section 3(b), Supplement C-1 addresses the issue of company contribution for healthcare coverages. Specifically, Supplement C-1 provides:

> (7) For Retired Employees and Certain Former Employees
>
> The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5, for:
>
> (i) A retired employee and his eligible dependents, if any, provided such retired employee is eligible for benefits under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan, and;
>
> (ii) An employee and his eligible dependents, if any, terminating at age 65 or older for any reason other than a discharge for cause with

-10-

insufficient credited services to entitle him to a benefit under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan.

(8) For Surviving Spouses

(i) The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 6(b) on behalf of a surviving spouse as defined in Article III, Section 6(b), (1), (2), (3) and (4) and in Article III, Section 6(c) . . . and the eligible dependents of any such spouse, provided, however that the contributions on behalf of a surviving spouse for the month the surviving spouse becomes age 65 and subsequent months shall be made only for months that the surviving spouse has the voluntary coverage that is available under the Federal Social Security Act by making contributions.

*Id.* at 8 (Pg. ID No. 2328).

### 2.  Duration Provisions

The 1995 CBA contained a duration provision in Article XIX, which specified that the agreement was to continue until February 7, 1999. Dkt. No. 39-2, p. 55 (Pg. ID No. 2280). The agreement could also continue past February 7, 1999, on a year-to-year basis, if the parties did not give notice of termination. *Id.* The 1999 CBA's duration provision stated that it would continue until February 9, 2003, and also contained a year-to-year provision. Dkt. No. 39-5, p. 5 (Pg. ID No. 2401). The 2003 CBA was to continue until February 11, 2007, Dkt. No. 39-6, p. 5 (Pg. ID No. 2406), but Kelsey-Hayes ceased operations at the Jackson plant prior to that date. Dkt. No. 40-12, p. 2 (Pg. ID No. 2734). Each of the CBAs provided that modification or termination of the agreement required written notice sixty days

prior to the specified February dates. *See* Dkt. No. 39-2, p. 55 (Pg. ID No. 2280); Dkt. No. 39-5, p. 5 (Pg. ID No. 2401); Dkt. No. 39-6, p. 5 (Pg. ID No. 2406).

Additionally, the CBAs provide that Supplement C and Supplement C-1 were "made part of this Agreement as if set out in full herein, subject to all provisions of this Agreement."[3] Dkt. No. 39-2, p. 54 (Pg. ID No. 2279); Dkt. No. 39-5, p. 4 (Pg. ID No. 2400); Dkt. No. 39-6, p. 4 (Pg. ID No. 2405). Supplement C states in Section 11 that it "shall continue in effect until the termination" of the CBA of which it is a part. Dkt. No. 39-3, p. 8 (Pg. ID No. 2319).

Supplement C-1 provides for the specific duration of health insurance coverage for employees who were laid-off, fired, or took a leave of absence in Article III, Sections 3 and 4. Dkt. No. 39-4, pp. 39–41 (Pg. ID No. 2359–61). Employees who were laid-off received coverage for "up to 12 consecutive months following the last month of coverage." *Id*. at 39. For an employee on a leave of absence due to disability, coverage was to continue "for a period equal to a maximum of the employee's Years of Seniority." *Id*. at 40. "Health care coverages for an employee who quits or is discharged shall automatically cease as of the last day" of the termination month. *Id*. at 41. If the Jackson Plant were to close,

---

[3] The sole exception is that the insurance contract was not subject to the same grievance procedure as the CBAs.

-12-

Supplement C-1 provided that employees terminated as a result of closing would be covered for "a maximum period of 12 months." *Id*.

Sections 3 and 4 illustrate that the parties knew how to limit the duration of health insurance coverage expressly within the contract. Yet, notably, in Sections 5 and 6, covering retirees and eligible spouses, the parties declined to set a termination date for coverages. Instead, Section 5 states that once an employee has retired or terminated employment after age sixty-five, the retiree's health benefits "shall be continued thereafter." *Id*.

### 3. Modification Provisions

Supplement C-1 contains a provision that allows for replacement or supplementation of plan coverages: "If in its judgment the Company considers it advisable in the interest of the employees, another arrangement may be substituted for all or part of the coverages referred to in subsection (a) above." Dkt. No. 39-8, p. 26 (Pg. ID No. 2439). However, Supplement C dictates that the provisions of Supplement C supersede the provisions of Supplement C-1, in the event of a conflict. Dkt. No. 39-3, p. 4 (Pg. ID No. 747). Supplement C requires mutual agreement between the parties for any modification:

> In the event the initiation of any benefit described in Article III of the Program does not prove practicable or is not permitted . . . , the Company in agreement with the Union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided.

*Id*. In sum, Supplement C restricts the Defendants' ability to modify healthcare benefits governed by the parties' agreement by requiring not only that the Union agree with the change, but also that any changes made be closely related and equivalent to the previous benefits provided.

### C. The Jackson Plant Shutdown Agreement

On September 30, 2005, the parties executed a Shutdown Agreement after Kelsey-Hayes notified the union of its intention to permanently cease operations at the Jackson plant no later than July 31, 2006. Dkt. No. 40-12, p. 2 (Pg. ID No. 2734). The Shutdown Agreement extended the 2003 CBA to remain in effect at the facility until it closed, except for the provisions modified within the Shutdown Agreement. *Id*. at 7, ¶ 18. Additionally, it provided that the provisions of the Shutdown Agreement would govern in the event of any inconsistency between the Shutdown Agreement and the CBA. *Id*. at ¶ 15.

Specific to employees eligible for retirement, the Shutdown Agreement allowed those eligible employees to "make a voluntary one-time irrevocable election to opt out of the Kelsey-Hayes Company Jackson Hourly Retiree Medical Plan and receive a lump sum cash benefit in place thereof." *Id*. at 6, ¶ 13.

-14-

**D. Interpretation of the Parties' Contracts**

The main goal of contract interpretation is to ascertain the parties' objective intent at the time the contract was entered, in light of the surrounding circumstances and relevant considerations. 11 R. Lord, Williston on Contracts § 30:6, pp. 98–104 (4th ed. 2012) (Williston). "[N]o rule requires 'clear and express' language in order to show that parties intended health-care benefits to vest." *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring). Instead, vesting may arise from implied terms, as well as explicit ones. *See id.* (citing *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 203, (1991)). After reviewing the parties' agreements for a second time, the Court again finds that the unambiguous language of the CBAs, Supplements, and Shutdown Agreement shows that the parties intended to provide for vested lifetime health insurance coverage.

The CBAs specify that Supplements C and C-1 contain the full text of the parties' agreement regarding health insurance. Dkt. No. 39-2, p. 54 (Pg. ID No. 2279). Within those supplements, the parties' negotiated language provides that healthcare benefits will be continued at the time of retirement, and that those coverages "shall be continued thereafter." Dkt. No. 39-4, p. 41 (Pg. ID No. 2361). Where the parties intended to limit the duration of healthcare benefits, they included specific language to do so. *Id.* at 39–41 (Pg. ID No. 2359–61). In stark

contrast, the parties included no duration limitation on the provision of healthcare benefits to retirees. *Id*. at 41.

Moreover, employees eligible for retirement at the time of the Shutdown Agreement were offered the opportunity to take a "lump sum cash benefit" in the place of the medical plan benefits they were to receive during retirement. Dkt. No. 40-12, p. 6, ¶ 13 (Pg. ID No. 2738). Were the Court to accept Defendants' argument that the retirees' healthcare benefits expired with the CBA, this provision in the Shutdown Agreement would bizarrely provide cash for benefits retirees were not entitled to receive. Such a reading is contrary to traditional principles of contract interpretation. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) ("In determining whether contractual language is ambiguous, the contract 'must be construed as a whole,' . . . so as 'to give reasonable effect to every provision in the agreement.' ").

Accordingly, having found the parties' contracts unambiguously demonstrated intent to provide for vested healthcare benefits for retirees, beyond the duration of the CBAs, the Court need not consider extrinsic evidence.

## E. Preclusion Doctrines

For the same reason as *International Union v. Kelsey-Hayes Co.*, No. 11-CV-14434, 2015 WL 5460631, at *8 (E.D. Mich. Sept. 17, 2015), the Court will decline to address Plaintiffs' preclusion arguments. ("This court believes it is

-16-

inadvisable, as well as unnecessary, to address plaintiffs' preclusion arguments because all of the decisions referred to by plaintiff were made before the Supreme Court issued its opinion in *Tackett*."). To apply the preclusion doctrine to these pre-*Tackett* decisions may run the risk of perpetuating the now invalid *Yard-Man* inference. *See C.I.R. v. Sunnen*, 333 U.S. 591, 606–07 (1948) (noting that the doctrine of collateral estoppel may not apply where there has been "sufficient change in the legal climate").

Similarly, the Court will not apply the *Carbon Fuel* doctrine. The doctrine stands for the proposition that judicial interpretations of CBA terms become part of those terms in later CBAs, if not altered by the parties' agreement. *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 222 (1979). As mentioned above, since prior cases may have been tainted by the *Yard-Man* inference, the Court will not engage in the application of this doctrine.

## V. CONCLUSION

For the reasons stated herein, the Court reaffirms its initial award of Summary Judgment and Injunctive Relief to Plaintiffs. The Court will **DENY** Defendants' Renewed Motion for Summary Judgment [100].

IT IS SO ORDERED.

-17-

Dated:      January 28, 2016

                                        /s/Gershwin A Drain
                                        _____
                                        HON. GERSHWIN A. DRAIN
                                        United States District Court Judge